PETTY et ux. v. CLARK et al.

No. 7074.  Decided April 21, 1948.  (192 P. 2d 589.)

See 16 C. J. S., Constitutional Law, sec. 623. First decision of intermediate court as law of case on appeal to court of last resort from subsequent decision, see note, 118 A. L. R. 1286. See, also, 3 Am. Jur. 541.

*A. Ladru Jensen,* of Salt Lake City, for appellants.

*George S. Ballif,* of Provo, for respondents.

WADE, Justice.

Plaintiffs, Charles B. and Maggie C. Petty, husband and wife and appellants herein, brought this action to recover from defendant Dean A. Clark the balance which they claim is owing to them, on a written contract of purchase and sale, as the purchase price of certain real estate in Hurricane, Utah. Plaintiffs also ask that such balance be adjudged a lien against the property purchased and that such property be sold in satisfaction thereof and that the lien be foreclosed against the defendants. The wife of Dean A. Clark and Hannah C. Pike, a judgment creditor of Clark, were joined as defendants in order to foreclose any interest which either of them might have in this property.

This case was here once before, see *Petty* v. *Clark,* 102 Utah 186, 129 P. 2d 568. In that case the trial court submitted the issues of fact to a jury on special interrogatories which the jury answered in favor of the defendant. But the court concluded that this was an equity case and the jury's findings were only advisory and made and entered findings and judgment contrary thereto. We reversed the trial court on the grounds that the findings of the jury were binding on the court and remanded it back for a new trial. On the new trial another judge was called in to try the case who again submitted the same issues of fact to another jury on special interrogatories, and again the jury found in favor of the defendant, and the court entered a judgment accordingly of no cause for action. To reverse that judgment plaintiffs appeal to this court.

In making the contract in question, only after much negotiation was a tentative agreement reached and the contract reduced to writing. Clark claims that on January 18, 1929, the day the contract was entered into, Petty came to his drug store at St. George, Utah, and brought with him the proposed contract with a promissory note already prepared; that each were dated that day and typewritten with an original and two carbon copies. That the original and carbon copies of the contract were already signed by the

Pettys and without careful examination he also signed them. That upon examining the promissory note preparatory to signing it he noticed that it provided for interest at one per cent per month from maturity on all installments not paid when due until paid. Whereupon he examined the contract more carefully and found that it contained a similar provision. He then stated that this provision was not in accordance with their previous understanding, which was that he should not be required to pay interest on any installment either before or after it became due, and that he would not sign such a note and unless Petty would agree to his terms the sale was all off. After some discussion Petty agreed to his terms and took a pen and Xed out, in at least one copy of the contract, which copy was later deposited with the bank, the paragraph which provided for interest on past due installments, whereupon he destroyed the note which Petty had prepared and drew an original and two copies of a new note on his own typewriter which provided that the payments should be made without interest and that he signed this new note.

Both Petty and Clark agree that a copy of the note and contract, together with a deed dated January 22, 1929, from the Pettys to Clark and a rider were, pursuant to the contract, deposited in escrow with the Hurricane State Bank, and that each of them retained a copy of these instruments. That later another rider dated November 12, 1932, was deposited with these papers in the bank which allowed a reduction in the monthly installments from $50 to $25 per month for at least a period of two years. Under the terms of the contract Clark agreed to pay Petty at the Bank a total of $4800, in payments of $50 each, commencing on February 1, 1929, and continuing for a period of eight years. In the interest clause in the contract which Clark claims was Xed out there was a provision that

"no interest should be charged until after maturity of the respective installments, and the second party (Clark) shall be given forty days grace on any payment, and the past due payments shall bear interest at the rate of one per cent per month until paid."

The note simply provides for same payments as the contract "without interest." On June 28, 1938, Clark completed his payments of $4800 without interest and the bank surrendered the escrow papers to him and he immediately recorded the deed.

Petty does not agree that the interest paragraph of the contract or any other part thereof was Xed out of the contract or any copy thereof before it was entered into or deposited with the bank. Nor does he agree that the note was rewritten to take out the interest clause and provide for no interest, or that he ever agreed to enter into any contract with the interest provisions of the contract omitted. He was not sure whether the contract and note were already drawn up before he went to Clark's Drug Store the day those papers were executed or whether he and Clark wrote them out on Clark's typewriter after he got there, nor is he sure whether Mrs. Petty signed it before or after it had been signed by Clark. But according to his testimony he is positive that no new note was written on Clark's objection to the interest provision thereof, and he is positive that neither he nor Clark nor any one else Xed out the interest provision of the contract on any copy thereof before Clark signed it or before it was delivered to the Bank or at all. As soon as Petty learned that the bank had surrendered the escrow papers to Clark and the deed had been recorded, he began negotiations with both Clark and the bank to recover the balance which he claimed was owing to him on the contract. After numerous negotiations and failing to reach a settlement he commenced this action on May 11, 1940.

In each trial the only issues of fact presented were: Did the parties, upon Clark's objection to the interest clause in the note and contract as originally drawn, agree that no interest should be payable on the installments either before or after maturity, and pursuant thereto was the note rewritten providing for the payment of the installments without interest and the paragraph in the contract providing for interest at one per cent per month on past due installments Xed out in the contract as executed and deposited

with the bank? In each trial these issues were submitted to the jury on special interrogatories and the jury in each case found in favor of Clark. In the first trial six of the eight jurors agreed on the findings, and in the last trial seven of them agreed thereon. In the first trial the court found the facts contrary to the jury's findings and entered judgment in favor of Petty. We reversed that judgment on the ground that the finding of the jury was binding on the court under Section 104-23-5, R. S. U. 1933, which is now same section of U. C. A. 1943, which provides that,

"in actions * * * for money claimed as due upon contract * * * an issue of fact may be tried by a jury, unless a jury trial is waived * * *."

Since that decision the legislature has amended that section of the statute by adding the following provision thereto:

"Included within the equitable suits in which a jury shall be only advisory to the court shall be suits to foreclose mortgages and other liens." Laws of Utah for 1945, Chapter 25, page 68.

Plaintiff's contend that in enacting this provision of the statute the legislature clearly expressed its intention to overrule our previous decision in this case. That it in substance and effect thereby said: That although under our statute in effect at the time of the previous trial in actions for money claimed as owing upon a contract the issues of fact raised on that question must, unless such trial is waived, be tried by a jury, yet in such actions to recover money claimed to be owing on a contract where the foreclosure of a mortgage or other lien to secure the payment thereof is also sought, the findings of the jury on such issues shall only be advisory to the trial court and may be reviewed by the Supreme Court on appeal.

From the wording of this amendment and the surrounding facts and circumstances we are convinced that such was the legislative intention in enacting it. It was enacted shortly after our previous decision. The provisions

which it adds deal exclusively with this kind of a case and the type of cases which were discussed in that opinion. Its language deals only with problems therein decided and contrary to that decision, it provides that in such cases the "jury shall be only advisory to the court." It also touches on the review of this court on appeal by providing that such type of cases shall be "included within the equitable suits" which, in view of our constitutional provision (Article 8, Section 9) that in "equity cases the appeal may be on questions of both law and fact," requires that this court review the facts on an appeal. Under these circumstances it appears clear that such was the purpose and effect of this amendment.

Defendant's counsel contends that even if this is true, still this amendment does not govern the second trial of this case. He argues that since this action was pending at the time this amendment was enacted we must give it a retroactive effect if it is to govern the later proceedings in this case. That Section 88-2-3 declares that the statutes shall not be retroactive unless expressly so declared. To this effect they cite *Industrial Commission* v. *Agee,* 56 Utah 63, 189 P. 414. There the application for workmen's compensation by the widow of a deceased employee was denied by the Industrial Commission and under Section 3148, C. L. U. 1917, she appealed therefrom to the district court which court sustained a demurrer to her complaint which ruling was reversed on appeal to this court. But before further proceedings were had in the district court the legislature amended Section 3148 by enacting Section 3148a, Laws of Utah for 1919, pages 154 to 166, chapter 63, which abolished the appeal to the district court and provided only for a review on questions of law by this court. The defendant moved the district court to dismiss the appeal for lack of jurisdiction under the amended statute which was then in effect. If the amendment took effect and governed the proceedings in that case which had been appealed to the district court under the statute before it was amended, then the applicant would have no opportunity to have the

decision of the Industrial Commission reviewed by this court because her time to make application therefor had expired before the amendment was enacted, and since the amendment did away with the appeal to the district court she would have no right of review whatsoever. Under those circumstances we held that to require her to proceed under the new statute, which she could not do because her time for making an application for a review thereunder had expired before the amendment came into effect, would be to give the amendment a retroactive effect, and that the legislature did not intend the statute to be so construed. In other words, we held that the legislature did not intend to deprive her of her right of review of the Industrial Commission's decision, under the old law, since the amendment had come into effect after it was too late for her to take advantage of the review provided for under the amendment, because such construction would give the amendment a retroactive effect and cause a grave injustice.

But this case does not present any such situation. Both parties are entitled to and can avail themselves of the full benefits of the amendment the same as though this action had not been commenced until after it had been enacted. In the *Agee* case we stressed the point ■ that it was decided on the facts and circumstances of that case, pointing out the injustice it would work on the applicant, and on that ground distinguished it from |*Boucofski* v. *Jacobsen*, 36 Utah 165, 104 P. 117, 26 L. R. A., N. S., 898, which held in effect that where a statute remedial in nature is amended providing a different remedy, all actions pending will be governed by the new statutory provisions. The reasons for the decision in the *Agee* case are entirely lacking here. The parties, in making their contract, did not rely on the provisions of the statute before it was amended, the amendment does not change the meaning of the contract at all, nor does the amendment deprive either party of any right which he would have had if the amendment had been enacted before the contract was made. Thus this statute does not retroactively effect the parties to this action.

Therefore, the decision in the *Boucofski* case governs here rather than that in the *Agee* case.

The 1945 amendment does not deal with the substantive right of the parties on which they relied in their dealings with one another out of which this action arose, but only deals with the method, or machinery of determining what the facts are. It provides that in cases of this kind the jury's decision is only advisory to the trial court and such cases are cases in equity and therefore under the Constitution the facts must be reviewed by this court on appeal. That is by nature a procedural rather than a substantive right. Such an amendment from the time it takes effect usually governs all future proceedings, except in cases like the *Agee* case where it would have the effect of cutting off all review rather than of substituting one method of review for another or for some other reason would work a hardship. Substantive law is defined as the positive law which creates, defines and regulates the rights and duties of the parties and which may give rise to a cause for action, as distinguished from adjective law which pertains to and prescribes the practice and procedure or the legal machinery by which the substantive law is determined or made effective. See *Mix* v. *Board of Com'rs*, 18 Idaho 695, 112 P. 215 32 L. R. A., N. S., 534; *Allen* v. *Bailey*, 91 Colo. 260, 14 P. 2d 1087; *Anderson* v. *Wirkman*, 67 Mont. 176, 215 P. 224; *Harris* v. *Morse*, D. C. 54 F. 2d 109; Vol. 40 Words and Phrases, Perm. Ed., pages 524 and 525. Where a statute is amended after the first trial and before the second to authorize nine out of twelve jurors to return a verdict where all twelve were required before, the amendment being of procedure and not of substantive law, takes effect immediately and governs the second trial. *Miami Copper Co.* v. *State*, 17 Ariz. 179, 149 P. 758, Ann. Cas. 1916E, 494; *Rosenfeldt* v. *St. Louis & S. R. Co.*, 180 Mo. 554, 79 S. W. 706. This statute does not contravene any constitutional provision and it certainly does not deprive any one of due process of law.

Nor does the law of the case doctrine require us to adhere to our former decision on this question. Under the law of the case doctrine it is usually held that where an appellate court in its opinion states a rule or principle of law which is directly raised on such appeal and is neces- ■ sary for its decision, that rule or principle must be adhered to and followed throughout all the subsequent proceedings in such case, both in the trial court and on a subsequent appeal even though the court may believe that it would have been better to have decided that question differently. See *Helper State Bank* v. *Crus,* 95 Utah 320, 81 P. 2d 359; *McGovern* v. *Kraus,* 200 Wis. 64, 227 N. W. 300, 67 A. L. R. 1381, also Annotation at 1390.

On the former appeal we definitely decided that the findings of the jury in a case of this kind was binding on the trial court and on this court on appeal. That question was definitely raised on that appeal and the decision thereof was necessary in order to dispose of the case. ■■ This case does not come within the exception from that rule established in the *Helper State Bank* case, supra. But the law of the case doctrine does not apply to a case where the policy of the law has been changed in the meantime by a legislative enactment, in a case where the amended provision deals only with procedure rather than with making a change in the substantive law. An extensive research has failed to disclose any case where any court has held that the law of the case doctrine applies to this kind of a situation.

A somewhat similar situation is presented where an intermediate appellate court announces a rule or principle of law on a question directly raised on an appeal to that court and the case is remanded to the trial court for further proceedings and thereafter the matter is again appealed to the intermediate appellate court, but in the meantime the highest court of appeals has decided the same question which the intermediate appellate court decided on the first appeal contrary to that decision. Under such circumstances the majority of the courts hold that the law of the case does not apply, but the court is bound by the decision of the highest

court of appeals. See *Hamilton* v. *Aurora Fire & Marine Ins. Co.*, 35 Mo. App. 263; *Wolf* v. *Dwelling House Ins. Co.*, 86 Mo. App. 580; also cases cited to that effect in 1 A. L. R. 1274 and 1275 Annotating that question; *Smith* v. *Denver & R. G. R. Co.*, 66 Colo. 510, 180 P. 683, cited in an Annotation on that question in 8 A. L. R. 1033. The foregoing annotations indicate that there are decisions to the contrary.

In accord with the decisions holding the law of the case doctrine does not apply is our case of *Steele* v. *Boley*, 7 Utah 64, 24 P. 755. There, on the first appeal we held that the adverse possession statute of limitations would run against the holder of a certificate of purchase of government lands. After that holding the Supreme Court of the United States decided that question contrary to our decision and on the second appeal to this court we held that the decision of the Supreme Court of the United States was binding on us in the second appeal. No express mention was made of the law of the case doctrine. The law of the case doctrine was very extensively discussed and held not applicable in *Johnson* v. *Cadillac Motor Company*, 2 Cir., 261 F. 878, 8 A. L. R. 1023, where the fact situation was similar to that in *Steele* v. *Boley*, supra. Generally the cases seem to determine the question now under consideration solely on the basis of whether the amendment to the statute deals with procedure or substantive law. We have found no case where the law of the case doctrine has been considered in connection with a change in the statute. Thus the amended statute must govern over procedure in this case since its enactment.

Unless we conclude, from a review of the record, that the findings of the jury and the trial court in the last trial was not supported by a preponderance of the evidence, it is not necessary for us to construe that statute now. In the last trial the trial judge as well as the jury found in favor of Clark on the facts. In his memorandum of decision the trial judge said:

"If the findings of the jury could for any reason be construed as being advisory only, the court would nevertheless, adopt the jury's findings * * *."

So it is necessary for us to review the record and determine therefrom whether we find that the judgment is supported by a preponderance of the evidence.

In reviewing such record we have repeatedly held that we should make an independent examination of the record, and should keep in mind the findings of the trial court thereon, and the fact that it heard the evidence and is in a better position that we are to determine the weight to be given to the oral testimony of the witnesses, and should only reverse the decision of the lower court where we are satisfied that the preponderance of the evidence does not support its decision. See *Stanley* v. *Stanley*, 97 Utah 520, 521, 94 P. 2d 465; for a review of our previous cases see concurring opinion in 97 Utah at page 527, and 94 P. 2d at page 468. Also *Crockett* v. *Nash*, 106 Utah 241, 147 P. 2d 853; *In re Bradley*, 109 Utah 538, 167 P. 2d 978; *Walton* v. *Coffman*, 110 Utah 1, 169 P. 2d 97; *Baldwin* v. *Neilson*, 110 Utah 172, 170 P. 2d 179.

We must therefore examine the evidence to determine whether the jury's findings are supported by a preponderance thereof.

The only evidence which supports Clarks' contention is: (1) His own testimony of what occurred at the time the contract was consummated. (2) The testimony of his wife that she saw the copy of the contract which was deposited with the bank after it had been surrendered to her husband, and noticed that the interest provision therein was Xed out as he claimed it was. (3) That the bank surrendered the papers to Clark upon his demand without notifying Petty thereof.

Convincing as his testimony apparently was it must be kept in mind that defendant and his wife are both interested witnesses. The only time that his wife ever claimed to have seen these instruments was the day he brought them home from the bank and handed them to her to be put away in a safe place. She testified that she looked through them and noticed that the interest paragraph of the contract was Xed out. This she claimed was done by drawing two or three

crosses from top to bottom of the paragraph with a pen, not by crossing each line out individually. Since those papers were handed to her after she supposed that the obligation represented thereby was completely paid and discharged, it is unusual that she would observe this Xing out so distinctly that she could, more than two years thereafter, remember it when she first was called on to testify thereon. Neither Clark nor his wife claim that they ever saw that instrument after the day it was surrendered to him by the bank. They make no claim to having examined it after Petty demanded more money, and with that in mind to have observed that this paragraph was Xed out.

The fact that the bank surrendered the papers tends to show that there was something in the papers that indicated to the person who handed them over that no interest was to be charged. Ordinarily we would not expect a banker to surrender such papers without making some examination to determine whether the party demanding them was entitled to have them surrendered to him. If the banker only read the note which expressly provided for the payment of the installments without interest, he might therefrom conclude without carefully reading the contract that no interest was provided for. If he, as he should have done, read the contract he would have read the interest provision therein, and if it was Xed out he would probably remember that fact. But Mr. Hirschi who was the cashier and the one who probably surrendered the papers, testified that he did not remember examining the contract on that day but that he thought that he did examine it on a later day and it was his impression that no provision was Xed out. If that paragraph was Xed out as Clark claims, it would not only free him from further payments but would also exonerate the bank and the cashier from any blame in the matter. So Hirschi's testimony is strengthened by the fact that it is against his own interest.

On the other hand, other witnesses and circumstances tend strongly to establish the facts to be as Petty testified. Petty testified positively that no such an agreement as

claimed by Clark was reached and that no part of the contract was Xed out in any of the copies thereof. He produced his copy of the contract. No part thereof was Xed out. Clark testified that the contract and note were typewritten with an original and two carbon copies and that Petty brought them with him when he came to his store, and that after Clark's objection to the interest provision the note was rewritten on his typewriter in order to eliminate that provision therein and insert the provision "without interest." If this were true then the note and the contract must have been written on different typewriters with a different ribbon, and by a different typist, and probably on a different kind of paper. An examination of these two instruments which were produced by Mr. Petty, and which were the originals and not carbon copies, show clearly that they were written on the same kind of paper, by the same typewriter, with the same blue inked typewriter ribbon, in the same stage of use, the same kind of letters and the same shadings in the letters. From these facts Clark's testimony on that point seems to be demonstrated to be incorrect beyond a doubt.

However, Petty was not sure whether he brought the original and copies of the contract and note with him to Clark's store the day they were executed or whether they were both written on Clark's typewriter in the store while they worked the details out together. He said sometimes he has had such papers drawn up by a stenographer ahead of time, and other times such papers were written in his presence while he and the other party worked out the details thereof, and he could not remember which way this was done. The evidence is clear that Clark was able to operate the typewriter but there is no testimony that Petty could do so. If these papers were drawn up in Clark's store as the details were worked out between the parties in accordance with one possibility under Petty's testimony still Clark's story of Xing out the interest provision of the contract and rewriting the note cannot be true. If Clark wrote the contract on his own

typewriter in his own store, or even if Petty operated the typewriter in writing these instruments while they were both there and discussing the provisions to be embodied therein, the interest provisions of the contract and note would never have been inserted because Clark would have objected thereto as it was written up and would not have waited until he was ready to sign the note.

It is interesting to note that Petty testified that when Clark presented to him for his signature the second rider he insisted that the last sentence thereof be added, a casual examination of the original of that rider shows even to the unskilled eye that that line was written by a different typewriter. The letters are shaped different, the printing is more distinct, showing a newer ribbon, and there are no shadings in the loops of the letters in the added sentence such as is quite conspicuous in the body of the rider and in the carbon copy of the rider which was produced in the last trial by Clark, and in that copy the writing in the additional sentence does not quite join with the writing in the body of the instrument but is slightly farther to the top of the paper and to the left-hand side thereof and the carbon was evidently new in the addition and printed much more distinctly than the one used in writing the body of the instrument.

The fact that Clark was unable to produce the copy of the contract which the bank surrendered to him, or his own copy thereof, casts grave doubt on the accuracy of his testimony. While it is possible that both those copies could have been innocently lost as he claims, still it seems to be a very unusual circumstance, for both of them to be lost since the production of either of them would be a strong circumstance to prove his claim if they would prove what he claims they would. Those facts create a grave suspicion that in fact such paragraph was not Xed out in either of them and that they were conveniently lost.

Other facts in the evidence tend to strengthen that suspicion. As soon as Petty learned that the deed had been surrendered he immediately claimed that there was more

money owning him under the contract. He produced a letter written July 27, 1938, within one month after the papers had been surrendered, wherein he demanded that the bank pay the balance to him and collect it from Clark. It was almost two years after the surrender that this action was commenced, during that time the parties had several conferences. All of them agree that one of such conferences occurred at the bank not long before the suit was commenced wherein Clark, Petty, Hirschi, and Cox, were present. Throughout all of these negotiations Clark himself does not claim that he ever made the claim that this interest paragraph had been Xed out prior to entering into the contract. The first time that there is any evidence in the record that he ever made any such claim is in his answer verified on October 7, 1940, wherein he denied generally that the contract pleaded was a correct copy of the contract which he signed, and only on the witness stand at the first trial did he first make his claim that the paragraph had been Xed out prior to consummating the agreement. It seems strange that he could have that much negotiations and not make it clear that such was his contention had that been the way he remembered the facts.

In detailing the conversation at the bank, above mentioned, all of the other three persons who were present testified that at that time Clark brought the copy of the contract which had been surrendered to him by the bank and it was examined by them there, and all except Clark agree that the interest clause was not Xed out at that time. They identify the instrument which they examined on that occasion as the one which had been surrendered to Clark by the bank because it had the notations of payments made on the back thereof.

The testimony of Mr. Cox, an attorney and former district judge, is very convincing on this point. He testified that he met Petty at Cedar City on the day in question, who told him he was contemplating bringing a suit against Clark and the Hurricane State Bank and asked him if he would take that case, that he answered that he would take the case

if it merely involved Clark but if the bank was involved, since he sometimes handled some of its business, he would not take the case. He agreed to go with Petty to Hurricane to investigate whether the bank would be involved and then determine whether he would take the case. When they got to Hurricane they went to the bank and met Hirschi, the cashier, who called Clark on the phone and shortly thereafter Clark came to the bank with some papers, which were later handed to Cox. Included in such papers was the copy of the contract which was deposited with the bank and had been surrendered by it to Clark, with the payments endorsed thereon. That the other three men, Petty, Hirschi, and Clark engaged in a discussion which became somewhat heated, during which time he was engaged in examining the contract to determine whether the bank was in the clear for having surrendered the papers to Clark without receiving interest, that in order to determine this he examined the interest clause in that instrument, that it was not Xed out, and based on that provision he concluded that the bank was definitely involved for having surrendered the deed without collecting the interest therein provided for. At that conversation even Clark does not claim that he made the claim that this interest clause was Xed out.

Cox came to Hurricane with Petty to determine whether he could accept employment from him. In order to determine this it was important for him to see the contract which was deposited with the bank, not merely Petty's copy. After seeing the instrument which was at that conference he refused to take the employment because he said he was convinced that the bank was involved. He claims that he saw the original instrument which was deposited with the bank and could identify it as such because the payments were indorsed on the back thereof. He testified that the interest clause was not Xed out of the instrument he examined. The details which he testified to were such that he would be apt to look for and to remember them. Since he was so interested in exonerating the bank from liability that he refused to take litigation against it, it was against his interests to

testify as he did. Under these circumstances his testimony must be given considerable weight against Clark.

Thus, the great preponderance of the evidence is in favor of plaintiff and against the defendants to the effect that the instruments produced at the trial are correct copies of the originals which were deposited with the bank, ■ and that the interest clause was never Xed out of the contract as it was executed by the parties. It follows that the findings of the jury on that point must be set aside and findings in accordance with the views herein expressed be substituted therefor.

The interest provision of this contract provides that the defendant "shall have forty days grace on any payment, and the past due payments shall bear interest at the rate of 1 per cent per month until paid." Since the grace period is provided for as a part of the interest pro- ■ vision we conclude that the parties intended that the interest should not commence to run on any installment or unpaid part thereof until after the expiration of this forty day grace period and then only on the unpaid balance until paid, and that no interest shall be paid on interest. That on payments that are affected by the second rider no interest shall be calculated on any payment until such payment is past due under the provisions of that rider and the forty days grace period has expired. Under that rider commencing from the 1st day of February, 1932, and continuing for a period of two years thereafter only $25 per month became due instead of $50.00 per month. All payments should be applied to the payment of any interest which had accumulated prior to the making of such payment and the balance, if any, to the past due principal. And defendant shall be allowed a period of 60 days after the entry of judgment and notice thereof is served upon him within which to pay the judgment before the lien shall be foreclosed.

We have carefully read the Findings of Fact, Conclusions of Law and Judgment and the schedules of payments and calculations of interest attached thereto which was entered

in the original hearing by Judge Hoyt, and except as to details hereinafter mentioned we find them to be correct under the present findings of the court. The finding that the second rider was entered into without consideration we hold to be incorrect. The amount of interest must be extended from the time the original judgment was entered to the time of the entry of the judgment in accordance with this opinion, and the court should make any other changes which the lapse of time have made necessary and correct any obvious mistake either in calculation or which is necessary to make the findings, conclusions and judgment conform to the views expressed in this opinion. We are of the opinion that plaintiff is entitled to recover a reasonable attorney's fee, incurred by him in the second trial and the second appeal to this court but since under the law as it existed during the first trial plaintiff did not prevail he is not entitled to recover attorney's fees for the first trial and appeal. The trial court shall fix what is a reasonable attorney's fee. Plaintiff is entitled to recover his costs for his original filing fees and for the second trial, and appeal to this court.

The case is remanded to the trial court with directions that findings, conclusions and judgment be entered in accordance with the views herein expressed.

McDONOUGH, C. J., and PRATT, WOLFE, and LATIMER, JJ., concur.